# TOM CHEADLE v. STATE.

(No. A-1937.   Opinion Filed May 1, 1915.)

1.   HOMICIDE—Alcoholic Insanity—Defense.   In a prosecution for murder, alcoholic insanity, or mental incapacity produced by voluntary intoxication existing only temporarily at the time of the homicide is no justification or excuse therefor.   To constitute insanity, caused by intoxication, a defense in a trial for murder, it must be insanity caused by chronic alcoholism and not a mere temporary mental condition.

2.   INSANITY—Delirium Tremens—Responsibility for Act.   Insanity though superinduced by excessive and long continued indulgence in alcoholic liquors and known as "delirium tremens," or "mainia a potu," renders a person so afflicted irresponsible for his acts, if it be of such a character as to deprive him of the mental capacity to distinguish between right and wrong, as applied to the particular act, whether he be under the influence of liquor at the time of the commission of the act or not; but, to do so, his affliction must be settled or fixed insanity, not a mere fit of drunkenness.  · A person, not previously laboring under such a disease or affliction, who voluntarily becomes intoxicated to such an extent and for such a period of time as to cause unconsciousness of his acts, is not irresponsible under the law for the acts done by him while in such mental condition.

3.   HOMICIDE—Defense Intoxication—Premeditation.   Intoxication, either voluntary or involuntary, is to be considered by the jury in a prosecution for murder in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because in connection with other facts, an absence of malice or premeditation may appear.

4.   SAME—Murder or Manslaughter—Intoxication.   Under our penal code, section 2313, Rev. Laws 1910, homicide is murder "When perpotrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being," and evidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree, must be of such character and· extent as to render the defendant incapable of entertaining or forming a design to effect death.   And the question is for the jury to determine.

5.   SAME—Premeditation.   A person who commits a homicide while so drunk as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree.

6.   **TRIAL—Instructions—Degree of Crime.** In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests, and if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, and where there was evidence of the intoxication of the defendant to the extent of being deprived of the mental capacity to deliberate or premeditate at the time of the homicide, it was prejudicial error to refuse to submit to the jury an instruction in reference to manslaughter in the first degree.

(Syllabus by the Court.)

*Appeal from District Court, Johnston County;*
*Robert M. Rainey, Judge.*

Tom Creadle, convicted of murder, appeals.   Reversed.

*Cornelius Hardy,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   The plaintiff in error was convicted of the murder of Tandy Harrell.   The information charged the homicide to have been committed by shooting the deceased with a pistol.   The court rendered judgment and the defendant was duly sentenced in accordance with the verdict to imprisonment for life at hard labor.

To reverse the judgment the defendant appealed by filing in this court on March 14, 1913, a petition in error with case-made.

The evidence shows that the defendant and the deceased, Tandy Harrell, were cousins and were, before the night of the tragedy, good friends.   It appears that the defendant's father was drunk in the town of Milburn, and his wife asked ' Jim Helms to take him home; Tandy Harrell went with them.   On the way they stopped at Harrell's home and got a bottle of whisky and a quart of alcohol.   The old folks went early to bed. Tandy Harrell and Jim Helms were playing pitch and they were all drinking whisky.   During the night the defendant and Harrell went outside, and the defendant fired two or three shots with his pistol; they came back into the house and finished drink-

ing another bottle; Helms threw the empty bottle into the fire-place and the defendant pulled his pistol and shot the bottle.

The only person present when Tandy Harrell was shot, that was called as a witness for the state, was Jim Helms. He testified that when they were eating in the kitchen, the defendant picked up a table knife and a cup and threw them at his sister Lorena; that he also picked up some of the dishes and threw them against the wall. Later he heard the defendant ask Harrell if he could shoot through the door and Harrell said, "Yes," and he fired a shot. That a little later the defendant fell across the foot of the bed. That he jumped up and Harrell grabbed him by the wrists and they were scuffling and fell over on the floor, with Harrell on top, and when they let him up he stood there cursing. Harrell said, "Tom, I don't want you to be mad at me, and I hope you will not be; I taken hold of you to keep you from doing the way you were doing." The defendant said, "That is the second time you have done me that way and you won't do it again, God damn you," and fired his gun. Harrell opened the door and the defendant shot again as he was going out of the door.

A. Allen testified that he saw Tandy Harrell after he was shot and the defendant was there and said, "Tandy, do you think I had anything to do with it," and Tandy said, "Yes, you shot me, but whisky was the cause of it," and the defendant said, "I never shot you, Tandy."

Dr. Guy Clark testified that he was a practicing physician at Milburn, and the defendant called him in the early morning and said that "Tandy Harrell had shot himself at their home, and that he had laid out in an outhouse." That when he reached the Cheadle place "he there found the deceased unconscious with a gun shot wound on the index finger of his right hand and a wound in the arm. Another wound was between the fourth and the fifth rib, about an inch and a half of the sternum and ranged down and came out near the spine."

For the defense Lorena Cheadle testified that she was a sister of the defendant and was sixteen years old; that after supper that night they were all playing cards; that Jim Helms

and cousin Tandy tried to get her brother to drink and he said, "No, cousin Tandy, I have quit." That about twelve o'clock her brother commenced drinking. The men drank whisky a while and then alcohol; they kept playing and drinking until about two o'clock in the morning. That when the shooting occurred she and her father and her brother, cousin Tandy and Jim Helms were in the room, and her father was asleep; that she did not see the shot fired and did not know who fired it; that the lamp went out. That Jim Helms took her brother's pistol from him about a half an hour before the shooting occurred, . and she did not see him give it back; that after the shooting Jim Helms grabbed her and they went to Jim Helm's house.

Mrs. M. V. Cheadle testified that she was the mother of the defendant; "That before she went to bed, Tandy Harrell and Jim Helms had both been trying to get him to drink and he would say, "No, thank you cousin Tandy, I have sworn off," and Jim Helms would say, "He thinks he is too stuck up." That she noticed the defendant take one drink.

As a witness in his own behalf the defendant testified in part as follows:

"Q. What time did you commence drinking? A. Some time between ten and eleven o'clock. Q. What were you drinking at that time? A. We were drinking whisky and alcohol. Q. What size bottle of whisky were you drinking from? A. It was a quart bottle. Q. Now, did you drink from that time on every time the others drank? A. Yes, from the first drink I did. Q. About how many drinks did you take if you know? A. I don't know. Q. You don't know? A. No, I don't know. Q. Who was the first person to induce you to take a drink there that night? A. Jim Helms was the first to ask me to drink. Q. Did you drink with him? A. No, I thanked him and told him that I did not want to drink, that I was trying to quit. Q. Then what occurred? A. They went on and the time come around for me and they wanted me to take a drink again and I thanked them and refused and Tandy said, 'Let him alone, Jim, he thinks he is too good to drink.' Q. Then what? A. I refused that time. Q. Then did you get to drinking? A. Yes, I finally did. They kept on insisting on me to drink and to keep them from thinking I was too good to drink, I drank with them. Q. Did you drink from any other bottle other than the quart bottle of whisky

and alcohol.   A. Yes, I drank out of a half pint bottle.   Q. Where did you get that?   A. Jim Helms had it.   Q. Did Jim Helms drink from it the same time you did?   A. I think he did the first time.   Q. Well, did you get drunk that night?   A. I did. Q. Well do you know what occurred there after you got drunk? A. No sir, I do not.   Not from eleven o'clock until the next morning, I don't remember.   Q. Why do you not remember what occurred?   A. I was drunk.   Q. Do you remember of having any trouble with Tandy Harrell in the kitchen?   A. No sir. Q. Do you remember of having any trouble with Tandy Harrell in the east room?   Q. No, I don't remember of having any trouble with anybody.   Q. Did you know anything about the shooting that occurred there that night.   A. I don't remember anything about any shooting at all.   Q. Do you remember whether or not you had a gun there that night?   A. No sir.   Q. Up to the time you lost your reason?   A. No sir.   Q. Do you remember anything about shooting any bottles in the fireplace?   A. No sir.   Q. What was the first time that you knew Tandy Harrell had been shot?   A. It was the next morning.   Q. How did you find it out the next morning?   A. My father woke me up and told me Tandy was shot and wanted me to go help get him in the house.   Q. What effect did it have on you when you heard that Tandy Harrell was shot?   A. I was shocked.   Q. You were shocked?   A. Yes.   Q. What did you do?   A. I got up from the bed and went out to where Tandy was and a little bit after that Mr. Cantrel and Allen came in and we carried him into the house and put him on the bed.   Q. Then did you have a conversation there?   A. Yes, I asked him if he thought I did have anything to do with it and he said 'No.'   Q. Why did you ask him what he thought you had anything to do with it for? A. Well, I was drunk that night and I did not want him to think I had anything to do with it.   Q. Had you and Tandy Harrell always been good friends?   A. We have been the best of friends. Q. After you got Tandy in the house what did you do?   A. I went to Tandy's house and told his folks and then went for the doctor.   Q. Who did you tell at Tandy's house when you got there?   A. I told Mrs. Harrell, his wife.   Q. Then what did you do?   A. I went on to town for the doctor.   Q. What doctor did you get?   A. I went for Doctor Guy Clark.   Q. Did you tell him Tandy Harrell had shot himself?   A. I told him Tandy was shot and he asked how he got shot and I told him he must have shot himself for all I knew."

We deem it unnecessary to detail further the facts disclosed by the record.

The errors assigned are based on exceptions taken to the overruling of a motion to quash and set aside the information and a motion to dismiss, and on exceptions to rulings in receiving and rejecting evidence, and on the refusal of the court to give requested instructions. A careful examination of the record leads to the conclusion that the only error assigned which we cannot disregard as merely technical and without substantial merit is the one that the court erred in refusing to submit to the jury the issue of manslaughter in the first degree.

The defense was based on two theories. One that Jim Helms, the state's chief witness, did the shooting; and the other that the defendant was temporarily insane if in fact he fired the fatal shot, and the homicide was excusable by reason of his insanity. In the instructions given, the court submitted the issue of murder and the defense of insanity. We are of the opinion that on the undisputed facts, the issue of insanity was not raised by the evidence. Alcoholic insanity, or mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the commission of the homicide, is no excuse or defense in a prosecution therefor. Drunkenness is one thing, and the disease of the mind to which drunkenness leads is a different thing. Temporary insanity, occasioned immediately by drunkenness does not destroy responsibility for crime, where the defendant, when sane and responsible, voluntarily makes himself drunk. To constitute insanity, caused by intoxication, a defense to an indictment or information for murder, it must be insanity caused by chronic alcoholism, and not a mere temporary mental condition. The distinction between a fit of drunken frenzy or madness, commonly called "delirium tremens," and temporary delusional insanity, a disease caused by excessive and long continued indulgence in alcoholic liquors, technically called "delirium tremens," or *"mania a potu,"* is well defined by the authorities and text writers.

See *State v. Kidwell,* 59 S. E. 494, 13 L. R. A. (N. S.) 1024. Wharton and Stille's Medical Jurisprudence, sec. 940.

The principle is everywhere recognized that voluntary intoxication is no justification or excuse for crime, and is no excuse

for homicide, though ·carried to the extent of producing inca-
pacity to control the mind and will, while intoxication does not
excuse homicide it may produce a state of mind in which one is
incapable of forming a design to take life, and evidence of in-
toxication is admissible only as bearing upon the existence or
nonexistence of malice.

*Miller v. State,* 9 Okla. Cr. 55, 130 Pac. 813.

Under our penal code, first subdivision, sec. 2313, Rev. Laws
1910, homicide is murder "when perpetrated without authority
of law and with a premeditated design to effect the death of the
person killed, or of any other human being," and evidence of
intoxication is admissible to show an absence of the premedi-
tated design to kill, for the purpose of determining whether the
offense was murder or manslaughter, and a state of intoxica-
tion which will reduce homicide from murder to manslaughter
in the first degree must be of such character and extent as to
render the defendant incapable of entertaining or forming a
design to effect death, and the question is for the jury to deter-
mine.

In Wharton on Homicide (3rd Ed.) it is said (pp. 809 and
811):

"Homicide committed when the accused was so intoxicated
that no intent to commit the crime of murder could have ex-
isted, however, not being murder in the first degree, is either
manslaughter or murder in the second degree. Intoxication can
not operate as an entire exemption from criminal responsibility,
and it is not conclusive against the existence of a criminal in-
tent. At the utmost it only extenuates the crime from murder
to manslaughter, and it does not do this, as matter of law.
Whether the accused was so intoxicated as to render him in-
capable of entertaining the specific · intent necessary to consti-
tute the crime is a question of fact for the jury. And it will
be presumed, in the absence of proof to the contrary, that the
accused, though intoxicated, intended the actual consequences
of his acts. And the burden rests with the accused to show
that he was so intoxicated as to be incapable of forming any in-
tent. * * * Intoxication, though involuntary, is to be consid-
ered by the jury in a prosecution for murder in the first degree, in
which a premeditated design to effect death is essential, with

reference to its effect upon the ability of the accused at the time to form and entertain such a design; not because, *per se,* it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear. Drunkenness as evidence of want of premeditation or deliberation is not within the rule which excludes it as an excuse for crime. And a person who commits a crime while so drunk as to be incapable of forming a deliberate and premeditated design to kill is not guilty of murder in the first degree."

The precise question involved here was decided in the case of *Aszman v. State,* 123 Ind. 347, 8 L. R. A. 33, Mitchell, C. J., delivering the opinion of the court, said:

"It is sufficient to say that, in order that there may be such premeditated malice as will make a homicide murder in the first degree, the thought of taking life must have been consciously conceived in the mind, the conception must have been meditated upon and a deliberate determination formed to do the act. Where a homicide has been preceded by a concurrence of will, with an intention to kill, and these are followed by a deliberate thought or premeditation, although they follow as instantaneously as successive thoughts can follow each other, the premeditator may be guilty of murder in the first degree. But as it is of the very essence of the crime that there should have been time and opportunity for deliberation or premeditation, after the mind has consciously formed the design to take life, it follows, as a necessary corollary, that there must have been the mental capacity to think deliberately upon and determine rationally in respect to the nature and consequences of the act which follows. It would be a legal as well as a logical incongruity to hold that the crime of murder in the first degree could only be committed after deliberate thought or premeditated malice, and yet that it might be committed by one who was without mental capacity to think deliberately or determine rationally. As a matter of course, the rule is universal that voluntary intoxication is no excuse for crime, nor does it in any degree mitigate or palliate an offense actually committed. To hold otherwise would unbridle crime and subvert public order. On the contrary, where there is reason to believe that one has conceived the design to commit a crime, and while harboring the unlawful purpose, voluntarily becomes intoxicated in order to blunt his moral sensibilities and nerve himself up to the execution of his preconceived design, the offense is thereby greatly aggravated. *State v. Robinson,* 20 W. Va. 713, 43 Am. Rep. 799.

"Where, however, the essence of a crime depends upon the intent with which an act was done, or where an essential ingredient of the crime consists in the doing of an unlawful act with a deliberate and premeditated purpose, the mental condition of the accused, whether the condition is occasioned by voluntary intoxication or otherwise, is an important factor to be considered. *Smith v. Com.,* 1 Duvall, 227; *State v. Garvey,* 11 Minn. 163.

"This in *Cline v. State,* 43 Ohio St. 332, 1 West. Rep. 81, the learned judge, delivering the judgment of the court, said: 'Where a person having a desire to do another an unlawful injury drinks intoxicating liquors to nerve himself to the commission of the crime, intoxication is held, and properly, to aggravate the offense; but at present the rule that intoxication aggravates crime is confined to cases of that class. But in many cases, evidence of intoxication is admissible with a view to the question whether a crime has been committed; or where a crime consisting of degrees has been committed, such evidence may be important in determining the degree.' *Pigman v. State,* 14 Ohio, 555; *Lytle v. State,* 31 Ohio St. 196; *Davis v. State,* 25 Ohio St. 369; *Roberts v. People,* 19 Mich. 401; *State v. Welch,* 21 Minn. 22.

"In the application of this principle, the Supreme Court of the United States reversed a judgment of conviction of murder in the first degree in *Hopt v. Utah,* 104 U. S. 63 (26 L. Ed. 873). The court below instructed the jury to the effect that 'a man who voluntarily puts himself in a condition to have no control of his actions must be held to intend the consequences. The safety of the community requires this rule. Intoxication is so easily counterfeited, and when real is so often resorted to as a means of nerving a person up to the commission of some desperate act, and is withal so inexcusable in itself, that the law has never recognized it as an excuse for crime.'

"The accused requested the court to give an instruction similar to that requested and refused in the present case. After asserting the general rule of the common law, that voluntary intoxication affords no excuse, justification or· extenuation of a crime committed under its influence, Mr. Justice Gray, delivering the judgment of the court, said: 'But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject

of consideration by the jury.' *Com. v. Dorsey,* 103 Mass. 412; *Pirtle v. State,* 9 Humph. (Tenn.) 663; *Haile v. State,* 11 Humph. 154; *Jones v. Com.,* 75 Pac. 403; *Keenan v. Com.,* 44 Pa. 55; *People v. Belencia,* 21 Cal. 544; *State v. Johnson,* 40 Conn. 136; Maxwell, Crim. Prac. pp. 227-299.

"So in *Buckhannon v. Com.,* 86 Ky. 110, the court said: 'A deliberate intent to take life is an essential element of murder. Drunkenness as a fact may therefore be proven as bearing upon its existence or nonexistence. It is not admissible upon the ground that in and of itself it excuses or mitigates the crime, because one offense cannot justify or palliate another, but because under the circumstances of the case it may tend to show that the less and not the greater offense was committed.' See, also, *State v. Sopher,* 70 Iowa, 494.

"In *State v. Johnson, supra,* the Supreme Court of Connecticut, in reversing a judgment of conviction of murder in the first degree, the court below having given and refused instructions similar to those involved in the present case, used the following language: 'A deliberate intent to take life is an essential element of the offense. The existence of such an intent must be shown as a fact. Implied malice is sufficient, at common law, to make the offense murder, but under our statute, to make it murder in the first degree, actual malice must be proved. Upon this question, the state of the prisoner's mind is material. In behalf of the defense, insanity, intoxication or any other fact which tends to prove that the prisoner was incapable of deliberation, was competent evidence for the jury to weigh. Intoxication is admissible in such cases, not as an excuse for crime, or in mitigation of punishment, but as tending to show that the less and not the greater offense was in fact committed.' *State v. Johnson,* 41 Conn. 585; *Jones v. State,* 29 Ga. 594.

" 'In those states,' says a learned author, 'in which murder has been divided by statute into degrees, it has been held that if the accused was intoxicated to such an extent as to deprive him of the power to form a design, the offense could be no more than murder in the second degree.' Lawson, Insanity, p. 74; 1 Wharton, Crim. Law, par. 51, 52.

" 'Drunkenness, we have seen, does not incapacitate one to commit either murder or manslaughter at the common law,' says Mr. Bishop, 'because to constitute either the specific intent to take life need not exist, but general malevolence is sufficient. But where murder is divided by statute into two degrees, and to constitute it in the first degree there must be the specific intent to take life, the specific intent does not in fact exist, and the

murder is not in this degree where one, not meaning to commit homicide, becomes so drunk as to be incapable of intending to do it and then kills a man.'   Bishop, Cr. L. par. 404.

"This court, although not always enunciating it with entire accuracy, has constantly recognized the rule declared in the above cases."

And Elliott, J., in a concurring opinion, said:

"I concur in the conclusion that the judgment should be reversed, for I think that the very able opinion of the court prepared by the chief justice unanswerably proves that where the element of premeditation is essential to create the crime of murder in the first degree, the accused cannot be found guilty of that crime if at the time of the killing he was so completely overcome by intoxication as to be incapable of premeditation."

In *Morris v. Territory,* 1 Okla. Cr. 617, 99 Pac. 760, it is said:

"If from any cause, at the time of the homicide, the mind of the defendant was in such a condition as to be incapable of forming a premeditated design to effect the death of the person slain, or of any other human being, he cannot be guilty of murder, unless it be proven that this state of mind, at the time of the killing, grew out of his intentional and wrongful conduct, of such character as to show that the killing was the result of previous premeditation and formed design."

In *Miller v. State, supra,* it is said:

"At most, a state of intoxication rendering the defendant incapable of forming a criminal intent would only reduce murder to manslaughter."

There is no intention here to give the least intimation of opinion as to the weight of this evidence, as establishing one conclusion or another in reference to the degree of homicide. The testimony is detailed simply to show that there was evidence tending to show the want of mental capacity to form a premeditated design to kill.

The brief filed by the state concedes error and concludes as follows:

"The evidence of the defendant presented the issue as to whether or not he was by reason of the immediate use of intoxicating liquors, unable to form a design to effect the death of Tandy Harrell.   Under the first sub-division of section 2320,

Rev. Laws 1910, homicide is not murder unless the accused entertained a design to effect death, and if the design exists, it is immaterial whether the accused is in a state of voluntary intoxication, and although being in a state of voluntary intoxication, yet the character of the act when the offense is divided into degrees and where as in homicide the intent is material, will be determined by the state of mind of the accused. So that where the evidence showed that the accused was drunk at the time of the commission of the homicide, evidence thereof is admissible as bearing upon whether the accused entertained a design to kill; and under the evidence in the case we believe that the court should have instructed the jury upon manslaughter in the first degree."

Our Procedure Criminal provides that:

"When it appears that a defendant has committed a public offense and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only." (Section 5877, Rev. Laws 1910.)

And that:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." (Section 5923, Rev. Laws 1910.)

In the case of *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685, it is said:

"It is always the duty of the trial court to instruct on the law of manslaughter if there is any evidence that the alleged crime might have been done under circumstances that would reduce the crime from murder to manslaughter.

"In other words, where there may be the slightest doubt in the mind of the trial court whether the crime was murder, then that doubt should be resolved in favor of the accused and a manslaughter instruction given."

After carefully considering the evidence we are of opinion that the refusal of the trial judge to instruct the jury in reference to manslaughter in the first degree constitutes prejudicial error. The judgment must, therefore, be reversed and the cause remanded for a new trial.

The warden of the penitentiary at McAlester, on presentation of a certified copy of this opinion by the sheriff of Johnston county, Oklahoma, is hereby directed to deliver the defendant, Tom Cheadle, to such sheriff, who shall confine the defendant in the common jail of Johnston county, there to await another trial, or until discharged according to law.

FURMAN and ARMSTRONG, JJ., concur.