## ELI THOMAS v. STATE.

No. A-3898—Opinion Filed May 10, 1921.

(197 Pac. 853.)

(Syllabus.)

1. **HOMICIDE — Voluntary Intoxication—Premeditated Design—Jury Question.** Voluntary intoxication is not a defense to a homicide committed with a design to effect death. To determine whether an admitted or proven homicide is murder or manslaughter in the first degree, the voluntary intoxication of the defendant to such a degree as to render him incapable of forming a premeditated design or intent to kill is a question of fact for the jury, guided by appropriate instructions of the court.

2. **SAME—Instructions—Sufficiency.** Held in this case that the instructions of the court as applied to the testimony fairly submitted the issue of voluntary intoxication and premeditated design to the jury.

3. **HOMICIDE—Murder—Instructions on Manslaughter and Self-Defense.** The evidence in this case shows there had been no quarrel or mutual combat between the parties, and there was no occasion for the court to give further instructions upon the law reducing the offense from murder to manslaughter, or upon the law of self-defense.

*Appeal from District Court, Le Flore County;*

*E. F. Lester, Judge.*

Eli Thomas was convicted of murder and sentenced to death, and he appeals.    Affirmed.

*Neal & Neal,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *E. L. Fulton,* Asst. Atty. Gen., for the State.

BESSEY, J.   On the 4th day of September, 1920, in the district court of Le Flore county, Okla., Eli Thomas was sentenced to suffer death for the murder of Selma Mayfield, and a death warrant was issued on that day directing the execution of the judgment and sentence on November 23, 1920. Afterwards execution was stayed by executive order until December 23, 1920.   On December 20, 1920, within the time provided by law, the defendant appealed from the judgment and sentence of the trial court by filing herein his petition in error with a duly authenticated transcript of the record of the case below, and execution was further stayed by this court pending this appeal.   Upon application of the defendant, plaintiff in error here, he was permitted in due time to file a case-made and attach the same to the transcript of the record on file in this court.

In an advisory opinion rendered to the Governor, under the provisions of section 5969, Rev. Laws 1910, filed for publication October 2, 1920, a narrative history of the proceedings was stated, to which reference is made, and from which it appears that up to that time there had been an observance of all the formalities essential to the taking of human life, and that the conviction and sentence of death was in accordance with the law of the land.

Now that this case is before us for judicial determination on appeal, it becomes our duty to review the case as a whole, and in order to better understand the issues raised

by the petition in error, in addition to the matters referred to in the opinion of this court to the Governor, a narrative synopsis of the facts, as disclosed by the transcript of the evidence, is given.

The tragedy occurred on the 6th day of August, 1920, at a picnic about four miles west of Calhoun, in Le Flore county. The defendant claimed that he was so under the influence of intoxicating liquor late that afternoon that he did not know what occurred after he mounted his horse and started for home.

Bertha McClain, a witness for the state, testified in substance that about one-half hour before sundown a crowd of the boys were preparing to leave this picnic ground and that he and Selma Mayfield, the deceased, went over some little distance south of the picnic ground to get their horses. There was a bunch of boys over north of where they were and they rode over that way. Witness was riding some few yards ahead of Mayfield, who was riding one horse and leading another, making him ride a little more slowly. As witness stopped about halfway between the ball ground and the picnic ground, Eli Thomas came riding from the picnic ground, and just as Mayfield rode ahead of him Eli said to Mayfield, "Where in hell are you going?" Mayfield looked back over his shoulder and said, "I am going to hell if I don't change my way." Eli said, "Yes, you G— d—bastard, you haven't got time to pray because you are on your way." Eli stopped his horse and dismounted and untied the end of a blue jumper tied to his saddle and turned around like he might be looking for a club or something. Witness thought it was about this time that Mayfield also dismounted. Then Eli stopped and looked up and said, "There is too d—— many," and turned and went back to

the horse and got his gun out of the jumper and went to shooting. Mayfield started to run around the horses, and the defendant shot again, going around the horses after him. Mayfield ran towards the ball ground, and Eli struck out after him, shooting at him. Witness could not be sure which shots hit the deceased, but there were four shots fired, and two of them struck Mayfield. Witness did not know what was said when Mayfield fell, but saw some fellows come over towards them, and one of them jerked the gun away from Eli. Witness did not know of any trouble between deceased and defendant prior to this time.

Jeff Tolbert, a witness for the state, testified in substance that there was a bunch of boys out northwest of the picnic grounds about 50 yards, that Bertha McClain came up that way on horseback, and that right behind him came Selma Mayfield, riding a horse and leading one. Eli Thomas approached, also riding a horse, and asked Selma Mayfield, "Where in hell are you going?" Mayfield answered, "To hell if I don't change my ways." Then Eli said something like he would not be long about going, and got down off his horse and started like he was going to get a club. Mayfield got down off his horse, and Eli went back to his horse and got a gun out of a jumper tied on to the saddle and started towards the Mayfield boy and shot him just as he went around his horse. Eli followed him around, shooting at him, and when the third shot was fired witness ran off.

Joe Daugherty, a witness for the state, testified that there was a bunch of boys gathered about 75 yards from the stands out there, and that he started to where they were and got within about 35 or 40 feet of where they were. Selma Mayfield and Eli Thomas rode along, and Selma was

riding a little faster than Eli, and Eli asked Selma where he was going, and Selma said, "I am going to hell if I don't change my way." Eli said, "And by G—— I am going to help you along." Then the two got down off their horses about the same time, and Eli went to his jumper that was tied on the saddle and ran his hand in there and took it out, and then turned around and went back and got his gun out of the jumper and shot Selma as he was standing at the horse's head. Selma started to run around his horse and Eli shot the second shot, and it seemed like he hit the horse, because the horse ran off, and Eli followed him all around and shot the third and fourth shots. Selma ran about 25 or 30 feet before he fell. Some fellow ran up and took the gun away from Eli when he was about 10 feet distant from where Selma fell. At the time Eli began shooting Selma had started to run around his horse.

Roy Nixon, a witness for the state, testified in substance that this colored boy, Eli Thomas, was coming from the west, going toward the east. The white boy, Selma Mayfield, was coming facing the north. They crossed, Eli coming right in behind the white boy, and he asked him where he was going, and the white boy said, "Going to hell if I don't change." Eli said, "Yes; you are, and you are going right now." Then he got off of his horse and made for a club, and the club was too big, and he went back to his horse and got a gun and went to shooting. Eli got off of his horse first, and Selma got off his horse and went on the other side of the horse. Mayfield began to run after the second shot was fired. Eli took after him and fired two more shots. Burl Hornback's boy caught Eli and took the gun from him, after he had pursued Mayfield about 50

yards. Mayfield fell down or sat down, and Eli was about 15 feet away when the Hornback boy got the gun.

Eli Thomas, the defendant, testified in his own behalf, substantially as follows: That he was 22 years of age; that he was a married man and lived about a mile and a half from Calhoun; that he was slightly acquainted with Selma Mayfield; knew him when he saw him; that he went to Calhoun between 9 and 10 o'clock the day of the picnic and started drinking over there, where he got hold of some choc and drank it; that he then started for the picnic grounds, and on his way over there he and another boy bought a quart of wild-cat whisky, which they drank; that was about one-half mile from the picnic grounds. Further on and nearer the picnic they met up with a colored fellow who had a keg of choc, and three of them bought three gallons of it and drank all of it. Defendant got into the wagon where the choc was because he could not ride his horse, on account of the way his head was "going around" and because he could not see. When they got to the picnic ground, they got hold of a 40-cent bottle of lemon extract from the Raleigh medicine man. After they drank that defendant got out of the wagon where the choc was and got into Tom Mullens' wagon and lay there a little while. His horse was standing at the back end of this wagon. At this point defendant testified, "I got out of the Mullens wagon and got on my horse, and that is all I remember until after they arrested me." Defendant stated that he had had no difficulty at any time with Mayfield and would not have done what he did for anything, that he just tied the gun on the saddle and went to the picnic and had no intention of hurting anybody, and that he had never been in trouble of any kind before.

On cross-examination the defendant stated that he and Kinley James together drank a gallon of choc at Calhoun; that they bought the quart of whisky from Isam Boyd about a mile from the picnic grounds about 12 o'clock and drank it within a short time after they bought it; that soon after this they met up with Ed Nails and with Will Mills, and two other boys, who had this keg of choc, and that they purchased three gallons of it about 3 o'clock; two of the boys got drunk and got down by the side of the road; it was about 4 o'clock when he got out of the wagon containing the choc and got into Tom Mullens' wagon; that he stayed there a while and then got on his horse and started home; that he remembered getting out of this wagon and onto his horse, but that was all he remembered; that no one assisted him to get on his horse; that he did not remember seeing Selma Mayfield that day.

Sally Payton, a witness for the defendant, testified that she saw the defendant two or three times that day, at different places on the picnic grounds, and that he was intoxicated, and that the last time she saw him he was shooting.

Tom Mullens, deputy sheriff, a witness for the defendant, testified that he saw the defendant, Eli Thomas, several times that day, and that he did not know whether he had been drinking that day or not: that he heard gunshots about 300 or 400 yards away, and that he immediately started to the place where the gun was fired; that he saw Selma Mayfield pursued by Eli Thomas, who was shooting at him; that Eli followed Selma until they were only a few feet apart, and Selma fell, and that McKinley Hornback took the gun away from Eli, after which witness placed the defendant under arrest. On cross-examination by the state

this witness said he asked Eli how he came to do this and
he said he did it to save his own life; that Bertha McClain
had a gun drawn on him and the other fellow had his hand
in his bosom as though he was going to draw a gun.

McKinley Hornback, a witness for the defendant, testi-
fied that he saw the defendant about 5 o'clock in the after-
noon coming from the picnic ground towards the ball
ground; that he was in Ernest Eubanks' wagon when wit-
ness first saw him; and that he afterwards walked to the
ball diamond where they were playing.    After that witness
saw defendant on the picnic ground, and the latter said he
was fixing to go home and was then looking for his horse.
A little later he was on his horse and stated he was going
home.    Eli stopped over there where there were some other
boys, and this Mayfield boy was coming along, riding one
horse and leading another and they met there about the
same time.    Witness was not near enough to hear what
was said, but saw Eli get down off of his horse, and he
seemed to be looking for a rock or stick or something, and
then he went back to his horse and said, "All three of you
get down while I get my gun."    By this time the witness
was pretty close to him and the shooting began.    Witness
tried to get there to prevent the trouble and finally over-
took defendant and reached out and got the gun by the
barrel and Eli turned loose of it.    Witness did not see Eli
drinking that day, but thought that he had been drinking.
Witness was a brother-in-law of Eli Thomas.

George Kinnemore, a witness for the defendant, stat-
ed he did not know whether the defendant was drinking
that day or not; that he seemed to have been drinking, but
witness did not see him drinking; that he just acted "nice"
and like he was having a good time like the other boys.

Bertha McClain, recalled in rebuttal for the state, denied that he had a pistol or that he drew a pistol on the defendant that day; that the deceased, at the time he was shot, had the bridle reins of one horse in one hand and with the other hand held the rope by which he was leading the other horse; that witness did not have his hands in his bosom as though he was going to get a pistol. Right after the difficulty Louie Maybry searched the witness and found no gun.

Louie Maybry, called on the part of the state, testified that Eli stated that Bertha McClain and Selma Mayfield had pistols, trying to shoot him. We quote from the record:

"Q. He said that Bertha McClain and Selma had a pistol trying to shoot him? A. Well, he didn't call his name—he called Bertha's name, and he said, 'the other fellow.'

"The Court: I understand the question of self-defense isn't interposed.

"Mr. Fowler: It isn't interposed.

"Mr. McCurtain: I understand he put some witnesses on to the effect that the defendant at the time claimed that this man was trying to shoot him.

"Mr. Fowler: That was brought out by the state.

"The Court: I understand that the defendant didn't claim that he shot this man in self-defense.

"Mr. Fowler: We do not.

"Mr. McCurtain: I had understood the testimony of the witness Mullens to be that he had Bertha McClain arrested. That testimony was brought out by the state, but I was just simply wanting to meet the testimony that he

at that time claimed that this man was trying to shoot him."

This is substantially all the testimony that was given in this case.

There were no exceptions saved at any time during the trial to the admission of any testimony.

There were no instructions asked by the defendant, and none given by the court, covering the law of self-defense.

There was no motion for a new trial filed, no motion for an arrest of judgment, and the attorney who tried this cause never took any further steps in the case after the rendition of the verdict of guilty.

## Specifications of Error

The plaintiff in error specifies as error apparent in this record the propositions as follows:

(1) The evidence is insufficient to sustain the verdict of the jury and insufficient to sustain any verdict other than a conviction of manslaughter.

(2) The court erred in failing to instruct the jury as to the substantive law of the case. (a) No instructions as to the law of self-defense; (b) No instruction as to the doctrine of mutual combat, reducing the offense from murder to manslaughter.

(3) The record discloses that the plaintiff in error was deprived of his right to appeal in this cause by case-made.

The defendant, under the first specification of error,

claims that the evidence shows: First, that the defendant was at and prior to the time of the homicide in such a state of intoxication as to render him incapable of taking human life; and, second, if such state of intoxication did not exist, that the defendant was justified in taking the life of the deceased in his own necessary self-defense.

The question of whether the homicide, under the evidence, was murder, or whether, by reason of the voluntary intoxication of the defendant to such an extent that he was incapable of forming a premeditated design to kill the deceased, the offense was reduced to manslaughter in the first degree, was fairly submitted to the jury in three separate instructions, which, considered as a whole, correctly stated the law; and it was for the jury, guided by the court's instructions, to determine from the testimony whether the defendant was in fact so intoxicated that he had no premeditated motive or design to kill the deceased. *Stouse v. State,* 6 Okla. Cr. 415, 119 Pac. 271; *Updike v. State,* 9 Okla. Cr. 124, 130 Pac. 1107: *Cheadle v. State,* 11 Okla. Cr. 566, 149 Pac. 919.

With the exception of the testimony of the defendant himself, there was no evidence showing that the defendant was intoxicated to such an extent as to render him incapable of forming an intent or design to kill Selma Mayfield. The defendant is bound by the statements of his own witnesses, and the testimony of these witnesses indicated that he was not so intoxicated. Under the instructions of the court this question was submitted to the jury, and the jury, by its verdict of murder, imposing the death penalty, evidently found that such a state of intoxication did not exist.

As to the questions of fact relating to intoxication to

such an extent as to negative premeditation or design to kill, and the instructions of the court upon that question, the representatives of the Attorney General's office for the state do not agree. After a full and careful consideration of the evidence shown in this record and the instructions of the court upon the question of voluntary intoxication, this court is of the opinion that the verdict of the jury should not be disturbed or the sentence on that account modified.

The defense of self-defense is inconsistent with the defense of intoxication to such an extent as to render one incapable of forming an intent or design to kill. If the defendant was so intoxicated as to be incapable of forming such intent, he would at the same time be incapable of having motives that would cause him to act in self-defense. Under the circumstances disclosed by this record, where there had been no difficulty or ill feeling between the parties and no quarrel or mutual combat, there was no occasion for the court to instruct the jury as to the law of self-defense, or to give further instructions reducing the crime from murder to manslaughter. In the trial below the defendant did not claim self-defense, and he has no right to insist on such defense here. However, if the evidence disclosed any of the elements of self-defense, the verdict being for murder, imposing the death penalty, we would be inclined to consider it, even though the question was not raised in the court below.

The third assignment of error need not be considered, further than to state that, since the defendant's brief was filed and within the time provided by law, the defendant has been permitted to file his case-made and attach the same to the transcript of the record and petition in error prev-

iously filed; so that the defendant's case has been considered on both the transcript of the record and the case-made, by which the defendant has been accorded his right of appeal by both methods.

The order in the death warrant fixing the hour of execution between 4 o'clock a. m. and 4 o'clock p. m. of the day set was unauthorized. It was the duty of the court, under section 5967, Rev. Laws 1910, as amended by Session Laws of 1913, p. 206, to appoint the day of execution only. It is for the executive branch of the government, under our laws, to fix the hour. Since the day and hour named in the death warrant have passed, and it is the duty of the executive to fix the hour of punishment, the error of the court in this regard is harmless.

For the reasons stated in this opinion, the judgment of the trial court is affirmed, and the warden of the state penitentiary at McAlester is hereby ordered and directed to carry into effect against this defendant the judgment and sentence of the district court of Le Flore county that he suffer death, said penalty to be executed on the 15th day of July, 1921, in the manner provided by the laws of this state.

DOYLE, P. J., and MATSON, J., concur.