**Cleve MILLER, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–63.**

Court of Criminal Appeals of Oklahoma.

June 14, 1974.

S. Thomas Coleman, Jr., Asst. Public Defender, Frank A. Zeigler, Legal Intern, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., John Wilkinson, Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

Appellant Cleve Miller, hereinafter referred to as defendant, was charged with the crime of Murder in the District Court, Tulsa County, Case No. CRF–73–577. He was convicted of the offense of Manslaughter in the First Degree and sentenced to ten (10) years imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

The facts in the instant case reveal that defendant and Gay Ozzo Fink, described as "the best of friends," had been drinking heavily most of the afternoon of March 29,

1973. Between 5:30 and 6:00 p. m. they were in the Midway Barber Shop in Sand Springs, Oklahoma, along with the proprietors, John and Ruby Morris. Defendant and Fink were drinking and visiting. All present were either close friends or acquaintances, and defendant and Fink were in the habit of visiting the shop regularly. On this occasion defendant had with him a pistol. A customer by the name of Arthur McArther came into the shop at approximately 6:15 and shaved himself. He testified that defendant went out to his (defendant's) truck and returned with two bottles of whiskey. At this point McArther noticed the butt of a .32 or .38 pistol sticking out of defendant's hip pocket. Noting that defendant was "intoxicated," he advised defendant to get rid of the gun as he "didn't like to be around where there is guns and whiskey." Defendant replied that he "didn't have but about six months more to live and he was going to go on one more toot." McArther left shortly thereafter, leaving defendant and Fink sitting in the front of the shop drinking. Ruby Morris was also in the front of the shop, and John Morris was in the back room resting. Ruby Morris testified that defendant and Fink chatted and drank aimlessly for a few minutes, until defendant began talking about his being "mistreated" in the past by the police. He stated that he was going to go outside and fire his gun into the air to attract the police. Fink attempted to talk defendant out of it, telling him not to get himself in trouble. He told defendant to shoot at him (Fink) instead.

At this point Ruby Morris saw defendant draw the pistol. Frightened, she ran into the back room. Immediately thereafter a shot was fired. From the back room she heard Fink call out to her, "Ruby, come up here, the son-of-a-bitch missed me." She testified that defendant and Fink were not mad at each other, in fact Fink was laughing and having a good time. When she went into the front room, Fink laughingly pointed to a hole in the wall behind his chair and told her that defendant had missed him. Defendant answered that he was not trying to shoot him, but could if he wanted to. Mrs. Morris then returned to the back room and heard a second shot a few minutes later. Again Fink called her back to the front saying, "I hear a ringing in my ears." He pointed to a second hole in the wall a couple of inches from the first. He and defendant were still laughing when Fink told defendant to shoot at him again. He asked defendant how he wanted him to hold his head for the third shot, saying "Having I got it fixed for you now?" Defendant said, "A little bit more like this," and then a third shot was fired. Mrs. Morris was in the front room at this time, but was turned away lighting a cigarette and did not actually see the third shot. She looked up and noticed a trickle of blood running down the side of Fink's head, and called to her husband that Fink had been hit. They administered some sort of first aid to Fink, and stopped the bleeding after a minute. Defendant, apparently thinking that Fink was faking, pointed out the third bullet hole in the wall and said that he could not have hit Fink. Fink revived in a few minutes and said, "Help me, Ruby." Defendant then told the Morrises to leave, that he would take care of Fink. Replying to this, and thinking that Fink had only been nicked, the Morrises left and went home. Fink apparently died shortly thereafter due to the bullet wound and resultant hemorrhaging. According to a pathologist who testified at trial, the original wound was fatal and even prompt medical care would not have saved the victim.

At trial, defendant testified that he had first gone to the barber shop that morning at approximately 10:00 a. m. and had taken one drink. He testified that he had been an alcoholic until four years before this incident, but had been forced by diabetes and a heart condition to curtail his drinking. Within the past two years open heart surgery had been performed upon him and the drink that morning was his first in several months. He stated that after the one drink, he went from the barber shop to his

house, where he was joined by Fink. After drinking heavily for two or three hours, they went to the Lazy H Bar. There they drank two beers, at which point defendant stated that his memory lapsed. He testified that he remembered none of the events of that afternoon and evening, and that he next remembered waking up on the front porch of his home about 2:30 a. m. the next morning. He then noticed that his truck was gone, and walked downtown to look for it.

Mr. Ben Wade testified for the defense that he saw defendant at about the same time walking down the street toward the barber shop from the general direction of defendant's home. He asked defendant what he was doing out at that hour, and defendant replied that he could not remember where he had left his truck and his keys. They then walked to the truck which was parked in front of the barber shop, and defendant found his keys in the open door of the truck. Wade stated that defendant appeared normal, and was not behaving in a drunken condition.

■ On appeal, defendant's first assignment of error concerns the refusal of the trial court to give two requested instructions submitted in writing by defense counsel. Both concerned the charge of Second Degree Manslaughter, and read as follows:

"DEFENDANT'S REQUESTED INSTRUCTION NO. 1:

Gentlemen of the jury, you are instructed that every killing of one human being by the act, procurement, or culpable negligence of another, which is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

"DEFENDANT'S REQUESTED INSTRUCTION NO. 2:

Gentlemen of the jury, you are instructed that manslaughter in the second degree is punishable by imprisonment in the penitentiary for not more than four (4) years and not less than two (2) years, or by imprisonment in a county jail not exceeding one year, or by a fine

not exceeding One Thousand Dollars ($1,000.00) or both fine and imprisonment."

Both instructions are in accord with the relevant statutory language of 21 O.S.1971, § 716, and 21 O.S.1971, § 722.

In refusing to instruct the jury on Second Degree Manslaughter, the trial court gave an instruction on Murder, and the following set of instructions on Manslaughter in the First Degree:

"TRIAL COURT INSTRUCTION NO. 4:

You are instructed that homicide is manslaughter in the first degree in the following cases:

FIRST: When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

SECOND: When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner or by means of a dangerous weapon, unless it is committed under circumstances as constitute justifiable homicide.

THIRD: When perpetrated unnecessarily while either resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed.

\*  .  \*      \*      \*      \*      \*

The crime of manslaughter in the first degree is punishable by imprisonment in the penitentiary for any number of years, not less than four."

This instruction encompasses the terms of 21 O.S.1971, § 711, and 21 O.S.1971, § 715.

"TRIAL COURT INSTRUCTION NO. 5:

You are instructed that Title 21, Section 1279 of the Oklahoma Statutes provides: 'It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not at any other person or persons either in anger or otherwise.' A violation of the above statute is a misdemeanor under Oklahoma law."

Apparently the trial court felt that a Second Degree Manslaughter instruction was unnecessary since the evidence was overwhelming that the death occurred while defendant was engaged in the misdemeanor act of pointing the gun at Fink. Thus, the defendant would clearly be guilty of First Degree Manslaughter. Defendant, on the other hand, argues that there was enough evidence of culpable negligence to warrant an instruction on Second Degree Manslaughter. He cites Harris v. State, Okl.Cr., 291 P.2d 372 (1955) in which this Court held the court has the duty to instruct the jury of the right to convict of a lesser included offense. He also relies on Cheadle v. State, 11 Okl.Cr. 566, 149 P. 919 (1915), wherein we stated that in a case involving homicide the Court should instruct on every degree of homicide which is reasonably suggested by the evidence. He also cites Igo v. State, Okl.Cr., 267 P.2d 1082 (1954), wherein we stated that the court should instruct on first or second degree manslaughter if there is any evidence that the circumstances would support a reduction from Murder to Manslaughter.

After an exhaustive review of the facts and the relevant authority, we are forced to reject defendant's argument. We base this rejection on the following: First, we note that the statutory definitions of Manslaughter in the First and Second Degrees are such that a homicide may be reduced in degree to Manslaughter in the Second Degree *only when it is not Murder or Manslaughter in the First Degree.* See 21 O.S.1971, § 716. Only then would the element of culpable negligence included in the definition of Manslaughter in the Second Degree, become relevant. In the instant case we note that the evidence was over-whelming that defendant committed the misdemeanor of pointing the pistol at Fink —in fact, all other logical explanations are virtually excluded. Thus, whatever culpable negligence can be attributed to defendant must be attributed to the manner in which he pointed the gun at Fink. This, in turn, means that even if defendant was culpably negligent within the interpretation of that term given by this Court [1], he was culpably negligent while committing a misdemeanor. The misdemeanor manslaughter doctrine set forth in Subsection 1 of 21 O.S.1971, § 711 [2] then becomes operative, and, under the instant facts, effectively precludes the possibility of a finding of Manslaughter in the Second Degree. In such a case we cannot say that the offense of Manslaughter in the Second Degree was "reasonably suggested by the evidence" as per Cheadle, supra, cited by defendant; rather it was conclusively eliminated.

A case applicable to defendant's first assignment of error is Glenn v. State, Okl. Cr., 333 P.2d 597 (1958), cert. denied, 359 U.S. 1014, 79 S.Ct. 1155, 3 L.Ed.2d 1039. There, the Court was faced with "a reenactment of the ancient story of William Tell." Just as in the instant case, the victim and defendant were involved in drunken horseplay with a gun, with fatal results. On appeal, the defendant there also raised the trial court's failure to instruct on Manslaughter in the Second Degree. The Court found that defendant's failure to request such an instruction waived his right to raise the issue on appeal. However, the Court commented: "There would have been merit to defendant's contention had a request [for a Second Degree Manslaughter instruction] been made . . ." While this language would seem to indicate a

---

1. ". . . . Culpable negligence is the want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions, and you are instructed that a person handling a deadly weapon will be required under the law to use a higher degree of care and circumspection than if using an instrument ordinarily harmless."

Jackson v. State, 84 Okl.Cr. 138, 179 P.2d 924 (1947), citing Kent v. State, 8 Okl.Cr. 188, 126 P. 1040, 1043.

2. "Homicide is manslaughter in the first degree in the following cases: 1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. . . . ."

contra result in the instant assignment of error than the one we have reached, we do not deem it to be controlling for two reasons. First, it was the purest of dicta in *Glenn,* supra. Secondly, the Court in *Glenn* apparently did not view the failure to instruct on Second Degree Manslaughter as fundamental error, or it would have reversed despite defendant's failure to request such an instruction. Under these circumstances, we do not feel that the above quoted language from *Glenn* is sufficient authority to overcome the reasons we have cited in support of the trial court's refusal to instruct on Second Degree Manslaughter. Accordingly, we find defendant's first assignment of error to be without merit.

■ In his second assignment of error, defendant asserts that there was insufficient evidence on which the court could have based its instruction on Murder. Apparently the defendant is arguing that his intoxication was so great as to make it impossible for him to form the premeditation necessary to support a Murder charge. This, however, was properly a jury question and the trial court was correct in so instructing. See Sharp v. State, Okl.Cr., 407 P.2d 593 (1965) and Thomas v. State, 18 Okl.Cr. 648, 197 P. 853 (1921).

■ The fact of defendant's drunkenness, and of his friendship with the victim, both have bearing upon the question of whether he was capable of the premeditation necessary to support a conviction for Murder. They do not, however, completely negate the possibility of premeditation so as to eliminate a Murder instruction. We note that sufficient premeditation to Murder can be formed in a mere instant. Jones v. State, 94 Okl.Cr. 359, 236 P.2d 102 (1951). Thus, the horseplay may have been the result of good-natured drunkenness from its inception even as late as the second shot. However, it cannot be said with absolute certainty that defendant did not form the necessary intent while Fink was "posing" his head for the third shot,

or at any other time up to the firing of the third shot. Thus, defendant's premeditation or lack thereof, was properly a jury question, and the trial court was correct in submitting a Murder instruction to the jury. Defendant's second assignment of error is also found to be without merit.

Having dealt with all of defendant's assignments of error, and finding nothing that would justify modification or reversal, the judgment and sentence appealed from is accordingly, affirmed.

BLISS, P. J., concurs.

BRETT, J., specially concurs.

BRETT, Judge (specially concurring).

While we feel that our decision to affirm defendant's conviction is correct and just as per the legal issues raised on appeal, we are not insensitive to the circumstances which led to this tragic incident. Defendant and his victim were by all account close friends of long standing. The horseplay which led to the shooting was mutual, and evidence of premeditation or malice on the part of the defendant was extremely weak. When defendant took the stand in his own behalf, the State did not ·impeach his testimony with evidence of prior felony convictions. We assume, therefore, that there were none, but note that this assumption is rebuttable. Also relevant, *if verifiable,* would be the fact that defendant suffered from diabetes and a severe heart condition, and his life expectancy is, by his own words, short.

Under such circumstances, we would recommend to defense counsel that he make application to the trial court for suspension of sentence in accord with the provisions of 22 O.S.1971, § 994, which reads:

"After appeal, when any criminal conviction is affirmed either in whole or in part, the court in which the defendant was originally convicted may suspend the judgment and sentence as otherwise provided by law. Jurisdiction for such suspension shall be vested in said trial court

by a request by the defendant within ten days of the final order of the Court of Criminal Appeals. Any order granting or denying suspension made under the provisions of this section is a nonappealable order."