## GEORGE W. DODD v. STATE.

No. A-3917. Opinion Filed April 16, 1923.
Rehearing Denied Nov. 24, 1923.
(219 Pac. 952.)

(Syllabus.)

**Homicide—Evidence Sustaining Conviction of Manslaughter in First Degree.** Evidence and instructions examined, and conclusion reached that defendant had a fair and impartial trial, and that no prejudicial error occurred.

Appeal from District Court, Kiowa County; Thomas A. Edwards, Judge.

George W. Dodd was convicted of manslaughter in the first degree, and he appeals. Affirmed.

George L. Zink, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. George W. Dodd, plaintiff in error, hereinafter referred to as defendant, was, on the 14th day of August, 1920, adjudged guilty of the crime of manslaughter in the first degree for the killing of one Marshall Brooks, and sentenced to serve a term of 12 years' imprisonment in the state penitentiary.

This killing occurred on the corner of two of the business streets of the town of Mountain View on the 26th day of April, 1920, at about 1 or 1:30 in the afternoon. The killing was the outgrowth of enmity by the defendant toward the deceased. This enmity, defendant claims, was mutual, and was occasioned because defendant claims to have discovered, about three months before the killing, that deceased and defendant's wife had become intimate with each other. Up until about two months before the killing, and for some time previous thereto, defendant and deceased had lived on adjoining farms about five miles north of the town

of Mountain View. At the time of the killing, however, defendant was a resident of the city of Anadarko, Okla., to which place he had removed after discovering this alleged intimacy between his wife and the deceased, and defendant testified that he moved to Anadarko for the purpose of taking his wife from the neighborhood in which the deceased lived. Before removing to Anadarko, the defendant sought the deceased on an occasion when the deceased was working in his field. On that occasion defendant himself testified that he had the following conversation with the deceased:

"Q. Did you ever meet Brooks at all after that, and ever have any conversation with him? A. Yes; I met him after that. Q. Now, tell the jury about your meeting with him and where. A. Well, I made up my mind early after this trouble—after I suspected Brooks of being the man the letter was written to—I didn't want to meet him or live in the community and that one of us should move out of the country, and I made up my mind I had better move and that I would stay out of trouble and live for my family, if possible. I finally decided I would go and have a talk with him, and we met and had a talk. Q. Where did you meet? A. In the cornfield. Q. Whose cornfield? A. His cornfield. Q. Who went up there? A. I went to where he was gathering corn. Q. Tell the jury about it. A. When I first went up and when he first saw me, he jumped and went around back of his wagon and reached in his hip pocket after his gun, and I told him I hadn't come to hurt him but to talk the matter over, and we stood there and talked quite a while. Q. Did you tell him what your wife told you? A. I told him all my wife told me. Q. You told him? A. I told him about him coming there to see her and trying to make love to her and making love to her, and about him writing her letters and her writing letters to him. Q. What did he say about it? A. He said he done it; he said, 'George, yes; I have.' Q. What else was said on that occasion? Just tell all the conversation. A. I told him I had made up my

mind and I had thought I would kill him, but that I had finally decided I wouldn't kill him, that I would keep out of trouble and live for my children and live for my wife. Q. What did he say to that? A. Well, I told him that I didn't think we ought to live as neighbors any longer, or come in contact with each other at all, and he said he had too much property—was too well fixed to think about selling out and moving, and I told him I had already sold out and was going to move away. Q. What else was said between you? A. I told him he had almost ruined my life, and that it was hard for me to feel like myself, and that I could have killed him at different times. He said, 'George, I have expected that you would kill me, and it has worried me, and I have had to go fixed to protect myself.' Q. What else was said? A. There? Q. Yes. A. Then we had an agreement not to never meet each other or to ever meddle with each other's business and avoid meeting each other, and we further agreed that if one put himself in the other's path that both would know it meant trouble, and I said, 'Brooks, you know this is the kind of trouble that causes men to kill each other, and we simply can't afford to meet each other after having that kind of trouble.' He said, 'Certainly we can't, and we will naturally go prepared for each other.' Q. Now, Mr. Dodd, after that conversation did you ever meet Brooks again and be in close proximity to him, between that time and the time when you met in Mountain View on the 26th of April? A. I met him one time after that. Q. Was he close to you? A. He passed me in a car in the road as I was going to Mountain View, one Sunday evening just below his house. Q. Nothing was said on that occasion? A. Nothing at all, he just drove around me; I had a load of household goods going to town with them, aiming to ship the next morning. Q. You were moving away at that time? A. I was moving away at that time, and he passed me in this car.''

As to what occurred immediately preceding and at the time of the killing, the defendant testified as follows:

''Q. Did you see Brooks at all that day? A. Did I see Brooks at all? Q. Yes. A. While the old man was talking to

me I looked across the street diagonally from where I was standing and seen Brooks standing down the street by the side of the drug store, talking to Gib Wilson and some other fellow; I don't know who the other fellow was. Q. Were they in plain view of where you were? A. Yes, sir; they were in plain view of where I was. Q. Where were you standing —just about where? A. Well, sir, I was standing by the pillar. Q. In front of the bank—at the corner of the bank? A. In front of the bank. Q. On the corner at the corner of the bank? A. At the corner of the bank, yes, sir; I was standing there. Q. On which side of the pillar? A. I was on the south side of the pillar and to the south side on the southwest corner was where I was standing. Q. Against the pillar? A. Yes, sir; I had this arm against the pillar at this time, I think, that I looked over and seen these men. Q. Did you see Brooks do anything while he was over there? A. I was watching them, and they were talking. They had their backs to the drug store and their faces to the east, standing there against the drug store place, and I seen them both look over there at me, and they looked at me more than one time. Q. Did they move from where they were standing when you first saw them? A. They didn't move right at that time when I first saw them. Q. When did they move? A. Directly they moved after they talked a little bit. Q. Where did they move to? A. To the corner of the drug store and went east. Q. That is, who went up to the corner? A. Brooks and Wilson. Q. Then east across the street? A. Across the street. Q. Where did they go then? A. To the corner of the hardware store. Q. All right, then what did they do? A. They were talking and stepped up on the corner and looked east—I mean looked north— and there was nothing to prevent them from seeing me from where I was. I know they must have saw me from where they were. Q. Did they stop there any length of time? A. They hesitated there; they didn't stop for any length of time, and stepped down on a little walk that goes across the street. They were talking and they turned and walked north. Q. Along that little crossing that crosses the street to the First National Bank? A. Yes, sir. Q. How were they

walking, towards you? A. They were walking side by side—Brooks was on the right. Q. Do you think they saw you? A. I am sure they seen me from where they was, and from where they was standing. Q. Tell the jury how they approached you exactly and what happened? A. Well, they was—when they first walked up there at the corner of the hardware store I was afraid they would come across there; I wished they would go on east, and I knew Brooks to be a drinking man. As they started across that thought come in my mind about him being a drinking man, and I thought of the trouble I had had and what my brother-in-law had told me about Ab Dunaway. It all come in my mind then. I knowed that old man Howel had told Brooks I was in town, and I knew that he could see me, and if they had walked straight on in that footpath from one corner of the street there to the other he would have missed me about eight feet to the west. Well, I was watching them all the time that they was walking across the street. Brooks, he had his knife in his hand, in his right hand, and in his other he had a block of wood, or a stick of wood, something of the kind. I couldn't tell just what, and when they neared me I could see Brooks looking at me. He was looking at me when they got near enough I could catch his eye, and to my great surprise when they got in about ten feet of the sidewalk Brooks he angled to the northeast and Wilson come north. Well, I naturally thought it meant trouble and serious trouble. I thought of what Ab Dunaway had told me about Brooks and Wilson, and I didn't know who would start the trouble first. In order to keep Wilson from taking me by surprise, I took two or three steps southeast from that pillar. I was watching Brooks close all the time from the time he left this sidewalk, and just before he had this knife in his hand, and just before he got to where I couldn't see all he was doing he dropped his knife down toward his pocket, and I thought he meant to drop the knife on the ground and get a gun, and in order to keep Wilson from surprising me I took three or four steps southeast from where I was standing and at this time Brooks stepped up on the sidewalk directly in front of me, and I began firing at him at

once. Q. Do you know how many shots you fired? A. No; I don't know how many shots I fired. Q. When did you first fire? A. When Brooks fell. Q. Did you fire any shot at Brooks after he fell? A. No; I did not. I fired the shots as fast as I could pull the trigger, and he fell immediately after I fired the last shot. Q. You say that he lowered his hand with the knife in it, what did you think he was going to do? A. I thought he was going to put that knife in his pocket, or drop it on the ground and switch the knife for a gun; that is what I thought. Q. Going to pull a gun? A. Yes, sir; that is what I thought. Q. Did you believe danger was imminent to you? A. Yes, sir; I did. Right at that time I did.''

As to what occurred at the time of the shooting, S. A. Elkins, a state witness, testified as follows:

''Q. Now, tell what took place from the time you saw Dodd come out from that pier? A. Well, when he came out from the pier he brought the gun out rather in front of him, and he made something like about three steps, and as he made those three steps he made a little circle, come to the west a little, and then circled back to the east and had the gun in his right hand, and brought it kinda around and shot, and shot twice in succession, and then there was just a pause and then the third shot. Q. What was the distance as to time between the first and second shots? A. Well, I would say it was about this (knocks three times). Q. Then the distance of time between the first and second shots was shorter than the distance of time between the second and third shots? A. Yes, sir. Q. Did you see Brooks at the time the shots were being fired? A. No, I didn't see Brooks at the time the shots were being fired. Q. What prevented you from seeing him? A. My whole vision was centered on the man doing the shooting. Q. Was Dodd between you and Brooks? A. Nobody between Dodd and me. Q. I say was Dodd between you and Brooks? A. I don't know, I couldn't state that. Q. Was any one else on the sidewalk there besides Dodd and Brooks? A. Yes; there was a number on the sidewalk there. Q. Where were these? A. They seemed to be east and im-

mediately in front of this pier—in front of the First National Bank. There seemed to be a bunch of men standing in front, and Mr. Dodd had come a little west to get around that bunch. Q. Dodd was north of the bunch of men standing on the sidewalk? A. Yes, sir. Q. And this bunch of men was between Dodd and Brooks? A. Yes. Q. And is that the reason that Brooks—Dodd had to come around these men, to come west, to go around the men standing on the sidewalk, that it? A. I presume so. Q. He did go around these men standing on the sidewalk? A. Yes, sir. Q. Was any words spoken that you heard? A. Not that I heard. Q. Did you see the body of Brooks after the shooting? A. Yes, sir. Q. Can you state where the wounds on the body were? A. Well, there was one wound in the side of the head there back of the ears that seemed to have come out on the right side near the collar bone, and then there was a shot in the breast below the nipple, a little bit from the center, and then there was another wound in the left side that came out of the right side. It seems as if the bullet had entered a little bit back of the center of the body."

Other eyewitnesses for the state testified substantially as the witness Elkins. There were other witnesses who were in a position to see Brooks at the time the shooting commenced, and their testimony was to the effect that Brooks made no effort to attack the defendant at the time of the killing, and further there is testimony in the record that, shortly after the killing, the defendant stated that he had done "what he came there to do" or "what he intended to do." There is no evidence that the deceased was armed at the time of the killing other than that he had an open knife in his right hand, and just prior to the killing had been whittling on a piece of wood which he held in his left hand. After the killing, the knife was found in the deceased's right hand, and the piece of wood was found near his body.

The testimony on behalf of the state presents a case of murder. The defendant's testimony cannot be said to pre-

sent a case of justifiable homicide in self-defense. The most favorable view that can be taken of his testimony is that it tends to reduce the degree of the homicide to that of manslaughter in the first degree, of which degree he was found guilty. Two defenses were interposed, insanity and self-defense. The trial court instructed the jury on both issues. No complaint is made of the instructions covering the defense of insanity. This cause is asked to be reversed solely because of the giving of instruction No. 9, which reads as follows:

"No. 9. The law of self-defense is given a person for his protection, and it cannot be pleaded as a defense by one who himself is the aggressor, or who enters voluntarily into a difficulty armed with a deadly weapon, no matter in how much danger he may be placed in the course of the difficulty, nor how imminent it may become.

"In this connection you are further instructed that, if the defendant, George W. Dodd, armed himself with a deadly weapon for the purpose of having a difficulty with the said Marshall Brooks, and having reason to believe that it would or might result in death or serious bodily harm to defendant or said Marshall Brooks, or if said defendant sought to take the law in his own hands and kill said Marshall Brooks, then the defendant cannot plead self-defense in this case."

Under the undisputed evidence of the state and under the defendant's own testimony, there was no real or apparent necessity for taking the life of Brooks in order for the defendant to save his own life or prevent great bodily injury being done to him. The facts and circumstances in this case are almost identical with the facts and circumstances in the case of Nutt v. State, 8 Okla. Cr. 266, 128 Pac. 165, in which it is said by this court that the issue of self-defense was not presented by the evidence, and a conviction for murder sustained.

While in this case, as in the Nutt Case, it is contended that the trial court failed to fully cover the law of self-defense, and examination of the court's charge discloses that the law on that issue was covered by instructions Nos. 8, 10 and 11 in a manner more favorable to the defendant than the evidence warranted.

After a careful examination of the entire record, the conclusion is reached that the defendant had a fair and impartial trial; that under his own testimony he was not entitled to an acquittal, and under the testimony for the state he should have been convicted of murder; that the conviction for manslaughter in the first degree was the most favorable view to the defendant the jury could take of the facts in this case. The judgment is affirmed.

DOYLE and BESSEY, JJ., concur.