# JONES v. STATE.

No. A-11394.  Sept. 26, 1951.

(236 P. 2d 102.)

Wilson & Wilson, Frederick, and Percy Hughes, Hobart, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J.  The defendant, Fay Jones, was charged in the district court of Tillman county with the crime of murder; was tried; convicted, and sentenced to serve a term of life imprisonment in the State Penitentiary; and has appealed.

It is contended that the evidence was insufficient to sustain a conviction for murder, although counsel concede in their brief that the same might be sufficient to sustain a conviction for manslaughter in the first degree.

The evidence showed that Fay Jones, the defendant, and the deceased, Robert Lee McDonald, who was known in the community as Jack McDonald, both lived in or near the small town of Tipton in Tillman County.  The parties had been acquainted for several years.  The deceased, McDonald, was 29 years of age at the time of his death.  He had served with the marine corps during the recent war and had established a good record as a combat marine.  Fay Jones was 39 years of age and had lived in and around Tipton all of his life.  He and his brother, Lee Jones, were in the whiskey business and his brother and wife operated the Grand Union Bar in Tipton.  For about a year prior to the death of McDonald on September 2, 1949, the deceased and defendant had been engaged in several fights.  The first one occurred when the defendant and his wife drove to the home of deceased and challenged him to a fight and they got into the automobile of the defendant and drove over into Kiowa county by themselves, fought for several minutes, and then returned to where the father of the deceased, the wife of the defendant and others were waiting.  After that the parties had several fights but in all of them the deceased had apparently been the winner.  On the first day of

September, 1949, during the nighttime the parties had two different fights, in one of which the defendant was knocked unconscious when the deceased knocked him against the bar. On the morning of September 2, 1949, about 11 o'clock the defendant and deceased had another fight at Nash's Tavern, which fight was interrupted by the proprietor calling the officers. It appeared that the defendant and deceased had been gambling together and that the deceased had become indebted to the defendant in an amount approximating $375, either as a gambling debt or because of loans made by the defendant to the deceased.

The state's evidence showed that about noon on September 2, 1949, the defendant entered into Nash's Tavern with his pistol drawn and walked back to where the deceased, Jack McDonald, was sitting at the bar, and demanded the money which the deceased owed to him. The deceased borrowed $45 from the proprietor and offered it to the defendant, but the defendant demanded all of the money. The deceased then said he would have to go to the bank and get the rest of the money, whereupon the defendant stated that he would go with McDonald. McDonald then went out the door of the tavern with the defendant directly behind him with his gun in his hand. Shortly after emerging from the door of the tavern the deceased whirled and grabbed for the hands of the defendant but the defendant jerked loose and shot the deceased three times with a .32 caliber automatic pistol. The deceased stumbled off of the curb and crawled under the bed of a pickup truck. The defendant stated: "Now holler, Oh, Oh, Oh"; and when some bystanders suggested that they remove McDonald from under the truck and take him to a doctor, the defendant said, "Let the yellow son of a bitch die".

McDonald was taken to the hospital in Tipton and given medical attention but he died within two or three hours. The doctors and nurses who attended him stated that he was rational and conscious up until just a few minutes before he died. Mary Laing, who attended the deceased, testified that she was with him constantly from the time he was received at the hospital until he died, and the court permitted her to testify concerning the statement made by the deceased on the ground that said statement constituted a dying declaration. In this statement she related how the deceased told of the acquaintanceship had with the defendant and of his fight with him the night before; that deceased came to town on the day of the shooting for the purpose of paying his fine on account of the fight which he had with defendant the night before; that he had another fight with defendant and defendant stated that he was going to get his gun and kill him; that deceased did not leave town because he didn't believe that the defendant would kill him; that the defendant came back with a gun and demanded money; that the deceased saw that defendant meant business and that he had to please him, so he stated that he would go to the bank and get the money; that as they started to leave the cafe the defendant made a motion as if he were going to shoot the deceased in the back and the deceased then tried to grab the gun; and that defendant then shot him but he did not realize what happened until he was lying across the fender of the pickup and saw blood and knew then that he was shot.

The defendant proved by some witnesses that deceased had a quarrelsome and violent disposition, and proved by a taxi driver from Altus that about two weeks before the homicide occurred the deceased rode in his taxi and showed the witness a gun which he said he was going to use on the defendant. Another witness testified to a threat which the deceased had made towards the defendant, which threats were communicated by the taxi driver and the other person to the defendant prior to the time of the homicide.

The defendant testified in his own defense. His testimony concerning the prior difficulties had with the deceased was substantially the same as was the testimony related by the witnesses for the state up to the time of the commence-

ment of the fatal encounter. Defendant stated that he and his brother, Lee Jones, had changed cars that morning; that one of the cars was loaded with whiskey, and that he had taken the gun from the glove compartment and had the gun in his pocket during the first fight in the morning and at all times during the day up to the time of the homicide. Defendant testified that after the fight occurred in Nash's Tavern in the morning that he took one Bob Floyd home and was gone several minutes; that when he returned to Nash's Tavern about noon the deceased was there; that when defendant entered the tavern deceased got off of his stool and started toward defendant and that when he did defendant pulled the pistol from his pocket and asked deceased for the money which was owing to defendant; that his only purpose in drawing the gun was to keep the deceased from jumping on him again and giving him another beating; that he had no intention of shooting the deceased; that the deceased said he would go to the bank and get the money, and defendant then placed the gun back in his pocket and started following the deceased out of the tavern; that as the parties emerged from the tavern the deceased turned and grabbed defendant by both arms and started pushing him backwards; that defendant had his hands in his pocket at the time on the gun, and pulled the gun and shot deceased until the deceased turned him loose; that defendant knew in his own mind that deceased would kill him if he didn't shoot as the deceased had already threatened his life. On cross-examination of the defendant it was brought out that he had been convicted once before for killing a man and had served a term of imprisonment in the state penitentiary, and that he was then engaged in the illicit whiskey business. The defendant testified that he had seen the deceased when he was intoxicated on several occasions eat razor blades. In this he was corroborated by several witnesses who testified that when the deceased would get drunk he would ask for a package of razor blades and he would break them up on a sandwich and eat the sandwich, razor blades and all. On cross-examination the defendant admitted that he had engaged in quite a bit of fighting in the prize ring. He also admitted convictions for several offenses of assault and battery, in addition to a conviction for violation of the liquor law.

It was the contention of counsel for defendant that the facts surrounding the homicide were insufficient to show the defendant was guilty of murder, and that the verdict which was rendered was because of prejudice in the minds of the jury on account of the fact that defendant and his brother were notorious bootleggers, which fact was well known to everybody in Tillman county. We are impressed with the fact from the reading of the record that in all of the several fights engaged in by the defendant and the deceased the defendant was always the party who proposed the fight, or was what in law was termed the aggressor in each of these encounters. The defendant had evidently through his professional prize fighting experience been supreme in the field of fisticuffs around Tipton until he had his first fight with the deceased. After the deceased had whipped him the defendant thereafter fought the deceased many times and instigated trouble in the hope that he might emerge the winner in their fight. Some of the state's witnesses testified that after the first difficulty on the morning of the killing that defendant came by where the deceased was sitting in the pool hall and said to the deceased, "I will see you later, if it is thirty minutes or how long, by God I'll be ready for you". Although defendant stated that he had the gun in his presence at the time of this first difficulty, we believe it is reasonable to conclude from the record that the defendant left the pool hall, armed himself, so as to be ready for the deceased in accordance with the threat that he had made. Under these circumstances the jury could hardly keep from concluding that the defendant armed himself with a pistol and voluntarily entered into a combat with the deceased, knowing that in such combat either he or the deceased would be killed. Under such a state of the record the plea of self-defense would not avail. Wadsworth v. State, 9 Okla. Cr. 84, 130 P. 808; Dodd v. State, 25 Okla. Cr. 263, 219 P. 952.

The jury could have believed that the killing occurred in exactly the manner related by the defendant, but they did not choose to accept his version of the fatal encounter in the face of the physical facts and the testimony of many eye-witnesses to the difficulty.

It is contended that there is no evidence of premeditated design, but this court has many times held that the "premeditated design" mentioned in the statute defining murder, 21 O.S. 1941 § 701, may be formed instantly preceding the execution of the homicidal act. In fact it is provided by statute, 21 O. S. 1941 §§ 702 and 703:

"A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.

"A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."

See, also, Smith v. State, 59 Okla. Cr. 111, 56 P. 2d 923; Walker v. State, 91 Okla. Cr. 1, 214 P. 2d 961.

It is next contended that the trial court erred in overruling the motion for continuance. The basis for this motion was that the Mr. Percy Hughes of Hobart, who had been employed by the brother of the defendant, and assisted the firm of Wilson and Wilson of Frederick in the defense, was engaged to be in the trial of certain cases in the county court of Kiowa county for the week beginning October 10, 1949, and that by reason of this fact the said counsel would not be able to properly prepare the case for trial. The counsel mentioned was present at the time of the trial and actually engaged in the trial. It is not pointed out wherein the defendant suffered any prejudice by reason of the overruling of this motion for continuance, and we can see no merit to this contention.

It is next contended that the court erred in overruling the motion of the defendant for a change of venue. This motion for change of venue stressed the fact that defendant had previously been convicted of homicide in Tillman county and that his brother was well known in Tillman county as being in the whiskey business and that he could not have a fair and impartial trial in such county because of prejudice which existed throughout the county. Attached to the motion for a change of venue were excerpts from certain newspaper accounts pertaining to the facts relative to the shooting. Also attached to the motion were the affidavits of 22 parties from various sections of Tillman county who expressed the opinion that the defendant could not secure a fair and impartial trial in Tillman county on account of unfavorable publicity which he had received as a result of the shooting.

The county attorney filed an answer to the motion for change of venue and attached affidavits from 48 different people from various sections of the county, including newspaper editors, that they believed the defendant could have a fair and impartial trial in Tillman county. In Rawls v. State, 86 Okla. Cr. 119, 190 P. 2d 159, 160, this court stated:

"The presumption is that a defendant can get a fair and impartial trial in the county in which the offense charged was committed, and if that is not true, the burden is on the defendant to establish his right to a change of venue.

"If, on motion for change of venue, trial court is convinced that a fair and impartial trial cannot be had in the county, it is mandatory that the trial court grant a change of venue.

*        *        *        *        *        *

"The granting or refusing of a change of venue is a matter resting within the sound discretion of the trial court to be disposed of in furtherance of substantial justice; and action of trial court will not be disturbed on appeal, unless there is an abuse of discretion.

\*     \*     \*     \*     \*     \*

"To say that an application rests in the discretion of trial court does not mean that it may be granted or refused at the mere will or pleasure of the judge, but he is to exercise a sound judicial judgment in the interest of justice and prudence."

In Abby v. State, 72 Okla. Cr. 208, 114 P. 2d 499, 115 P. 2d 266, it is held:

"In this day of paved highways, the wide use of rural telephones, daily papers, and radios, the mere fact that the inhabitants of a county have read and heard of the commission of a crime does not disqualify them. To warrant a change of venue, it must be made to appear they have a fixed opinion as to the guilt or innocence of an accused to the extent that he cannot have a fair trial by an impartial jury."

The voir dire examination of the jurors is not contained in the record, neither does the record show the number of challenges for cause which were made nor the number of peremptory challenges exercised by the state and the defendant. We assume that there was no difficulty in securing a fair and impartial jury as there is no contention presented to that effect. The burden being upon the defendant to make a showing that he has sustained prejudice by reason of the failure of the court to grant him a change of venue, we are unable to conclude from the record which is presented that the defendant has thus sustained his burden. Under the record before us there was no abuse of discretion on the part of the trial judge.

The principal contention of the defendant for reversal of the case is the allegation that the trial court committed error in admitting the testimony of Mary Laing as to the purported dying declaration of the deceased. We have briefly hereinabove referred to this testimony of the witness, Mary Laing. It is the contention of the defendant that the dying statement was inadmissible as evidence for the reason that it contained many statements of facts or circumstances not immediately connected with the act of killing but concerning previous distinct transactions. Citing Goss v. State, 24 Okla. Cr. 383, 218 P. 339, 342; and Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532; and Wratislaw v. State, 18 Okla. Cr. 150, 194 P. 273.

In Goss v. State, supra, this court held:

"Dying declarations are not admissible where they consist of statements of facts or circumstances not immediately connected with the act of the killing, but relate to previous distinct transactions, even though they [may] have reference to occurrences which disclose a motive or provocation for the killing or show a state of hostility existing between the parties."

Mrs. Laing testified that deceased said he was going to die. He specifically said, according to her, "I will be dead tomorrow", "He was going to meet his maker", and "Would be in his coffin tomorrow". When the witness was then told by the county attorney to tell what the deceased had said, counsel for defendant made the following objection:

"By Mr. Hughes: If the court, please, from what the man said, that he would be in hell tomorrow; I don't think that would be admissible. By the Court: Go ahead. By Mr. Hughes: Exceptions. Q. Did Jack say anything as to how he got in that condition? A. He said he had been shot. Q. Tell what Jack said during the time you administered him. By Mr. Hughes: We renew our objection. By the Court: Overruled. By Mr. Hughes: Exceptions. Go ahead. A. Well, Jack came in like I said, and nearly the first thing he said was 'I'm going to meet my maker', and about the second thing he said was that he wanted glucose, and blood, and morphine; and that rather amused me that he knew he was going to get these things. We put him on the operating table and I asked him what happened and he said, 'I have been shot', and I asked him who shot him and he said Fay Jones did. Of course he was in great pain and we worked as fast as we could. He repeated himself constantly, and that was about the first things he said. We gave him plasma and he asked for morphine and we gave him morphine. Q. Did he tell

about the shooting? A. Later on, I would say about one and one-half hours; he made statements all along, never but two or three words. Q. Go ahead. A. His main thought was trying to breath. He was questioned by Mr. McBee, and Elmer Taylor and Bob Morey. He knew each one as he came in and he answered their questions; then he said that the night before—someone asked him about the night before, if he had a fight, and he said, yes, he had a fight with Fay, and he said that that night Fay said he was going to kill him the next morning and I asked him why he came to town and he said because he had to pay a fine; and he said when he came to town he went into the cafe and he said they had another fight and went in the pool hall and Fay said he was going to get his gun and kill him, and I asked him why he didn't leave and he said he didn't believe Fay would kill him. He said Fay came back and had the gun; he said Fay held the gun on him a long time and demanded money and he asked a man to get some money out of the drawer, and he said it wasn't enough money for the demand he made. He said Fay held the gun on him a long time and he said he knew he had to please Fay and he said he would go to the bank and get the money, and he said, 'Would you let me go to the bank and get it?', and he said 'Yes'. He said he started to leave the cafe and Fay made a motion as if he were going to shoot him in the back and it was then that he tried to get the gun, and the next thing he was lying across the fender of a pickup, and I said, 'Did you know you were shot?' and he said, 'No, not until I saw blood', and he said it was while he was lying under the pickup—that he got under a pickup, and then he claimed he never regained consciousness until they got him in the ambulance. * * * By Mr. Wilson: Comes now the defendant and moves that all of the testimony of this witness relative to the statements made by the deceased be stricken for the reason that they are hearsay, and that there are none of the requirements necessary to making them dying declarations. By the Court: Overruled. By Mr. Wilson: Exceptions."

In Wratislaw v. State, supra, this court had occasion to discuss at length written dying declarations which contain matter that is admissible and other matter that is inadmissible. In the body of the opinion it is said:

" 'It is a rule of general application that statements of facts and circumstances not immediately connected with the act of killing, but relating to previous distinct transactions, are not admissible as dying declarations; for declarations which relate to such transactions do not come within the principle of necessity on which such declarations are received. Therefore dying declarations by the injured party as to previous threats made by the accused, or as to previous attempts made on the declarant's life by the accused, are not admissible, for the declarant does not become a general witness. He can only speak of the transaction which caused the death, and such accompanying acts, statements, and conduct as shed light on it— the res gestae, in a strict sense. Anything previously done or said, unless called up and made a part of the altercation, cannot be proved as a dying declaration; and when so called up it can be proved as such only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement done or uttered at the time of the final fatal encounter and catastrophe, and which tend to shed light on it as a part of the res gestae, which can be so proved. If the rule admitting dying declarations can be extended to a separate and distinct act occurring half an hour before, it will extend to any act done the day before, or a week, month, or year. As soon as the limit fixed by absolute necessity is passed, the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible, not merely to prove the act of killing, but to make every homicide murder by proof of some old grudge.' " In the syllabus of the Wratislaw case this court adopted the following principles of law:

"Where a written dying declaration, for the admission of which in evidence a proper predicate has been laid, contains recitals of transactions had and statements made which do not shed light upon the homicide and are not res gestae in the strict sense, such recitals of transactions and statements are not admissible in evidence.

"Where a written dying declaration contains matter that is admissible in evidence and also matter that is objectionable, it is not error to overrule a motion to exclude such entire declaration.

"Where a written dying declaration contains matter that is admissible and also contains matter that is objectionable, the objector must specifically point out the parts that are objectionable, and not make a general objection to the entire declaration, if it is desired to have the exception to the ruling of the court available on appeal.

"It is reversible error for the court, where a written dying declaration contains matter that is admissible in evidence, and also contains matter that is objectionable, and which objections are specifically pointed out by an objector, to admit such entire declaration in evidence, where the objectionable matter is prejudicial to the substantial rights of the defendant."

We find that the purported dying declaration related by the witness Mary Laing contains a statement by the deceased concerning previous fights had with the defendant, but the most damaging part of the statement is her testimony that the deceased said that the defendant told deceased the night before that he, the defendant, was going to kill the deceased the next morning. Under all of the authorities, statements of previous threats made against the declarant are not admissible as evidence in a dying declaration unless such threats are called up and made a part of the altercation at the time of the homicide and are therefore obviously and intimately connected with the homicide.

It is insisted by the Attorney General that under syllabus 2 and 3 of the Wratislaw case, above cited, that the failure of counsel for the defendant to specifically object to the inadmissible matter contained in the dying declaration constituted a waiver of objection to such matter. Such rule is established as to written dying declarations, but this court has not had occasion to pass upon such question in respect to dying declaration which is verbally given. In such a situation counsel for the accused may not know what the testimony of the witness will be. In this case this is particularly true because the witness Laing was questioned by counsel for defendant several days before the trial as to her knowledge of the facts concerning the homicide and she refused to discuss them with counsel for the defendant. Counsel were not in position of knowing just what the testimony of this witness would be. The two doctors and the other attending nurse, the sheriff, deputy sheriff, and father of the accused, all of whom were in the hospital room at various times preceding McDonald's death, did not any of them purport to relate any dying declaration nor corroborate the testimony of the witness Mary Laing.

In order that the trial courts of the state may properly proceed in actions where verbal dying declarations are sought to be shown in evidence, we suggest the following procedure: If a question is raised as to whether the purported statement was made under fear of impending death a question of law is presented for determination of the court, and this primary fact, showing that deceased was conscious of impending death, must be established before the dying declaration may be given. After the court rules as a matter of law that the primary fact that the declaration was given under a fear of impending death and therefore admissible in evidence, upon motion by counsel for the accused the court should excuse the jury and in the absence of the jury should hear the testimony concerning the dying declaration in order to determine whether such declaration contains inadmissible matter. If such declaration does contain inadmissible matter, as was contained in the purported declaration herein introduced, the trial court should see that such was not repeated to the jury when the jury is recalled to the jury box upon resumption of the trial. Of course if the dying declaration is in writing counsel for the defendant would have an opportunity to read it and make

specific objection to any part they deem inadmissible, and where they fail to point out any specific objectionable matter the court does not err in refusing to sustain a general objection to the dying declaration.

In the instant case, after the witness had testified, counsel for the defendant moved to strike the testimony of the witness for the reason that "There are none of the requirements necessary to make them dying declarations". This general objection was insufficient and if counsel had desired that the objectionable matter should be struck he should have specifically pointed out to the court that part of the witness's testimony which contained inadmissible evidence.

There was sufficient proof that the statements made by deceased were made with knowledge on his part that death was near and the court properly overruled the objection to the admissibility of the dying declaration where such objection was based on the sole ground that the declaration was not made under sense of impending death.

The question presented by this assignment of error has caused this court deep concern primarily because it is one of first impression in the state. In view of the fact that the witness Mary Laing had refused to divulge to counsel for the defendant the things that she had heard deceased relate to her in the hospital deprives them of knowledge as to her testimony and places them in the position to where they were unable to object in advance to any specific portion of her testimony. The evidence as to the previous fights by the defendant and deceased were shown by many other witnesses, including the defendant himself, and this part of the dying declaration, although inadmissible as evidence, could not possibly have created prejudice because it referred to matters which were already abundantly proved by other witnesses, including defendant. However that part of the dying declaration containing the purported threat by the defendant the night before the homicide to get his gun and kill the deceased was very damaging to the defendant. This threat was not shown by any other witness. Even if counsel for the accused at the conclusion of the testimony of the witness had moved to strike this specific evidence and the court had sustained the objection, the jury would still have had the benefit of such evidence and its effect probably could not have been erased from the minds of the jury. On the other hand, we cannot conceive how the defendant even under his testimony could have escaped a verdict of guilty of manslaughter in the first degree and possibly of murder. He was always the aggressor. He shot an unarmed man.

Viewing the case in the most favorable light to the accuser, we have come to the conclusion that the admission of that portion of the dying declaration containing previous threats made by the defendant against the deceased possibly caused the jury to give the defendant more punishment than they might have done otherwise, and that justice would be served by modifying the punishment from life imprisonment in the state penitentiary for the crime of murder to a term of thirty years imprisonment in the state penitentiary for the crime of manslaughter in the first degree.

It is therefore ordered that the judgment and sentence of the district court of Tillman county be modified from a term of life imprisonment to a term of thirty years imprisonment for the included offense of manslaughter in the first degree, and the judgment and sentence as thus modified is affirmed.

BRETT, P. J., and POWELL, J., concur.