Donald R. CLOUSE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13392.

Court of Criminal Appeals of Oklahoma.

March 4, 1964.

Sam Sullivan, Durant, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Charles H. Collum, Asst. Atty. Gen., for defendant in error.

JOHNSON, Presiding Judge.

The plaintiff in error, hereinafter referred to as defendant, was charged in the district court of Bryan County with the crime of murder; was tried by a jury, who found him guilty as charged and fixed his punishment at life imprisonment in the State Penitentiary. Motion for new trial was overruled, judgment and sentence entered in keeping with the verdict of the jury, and defendant has perfected his appeal to this Court.

In the petition in error filed herein, the defendant sets out error as follows:

"A) The said district court of Bryan County, Oklahoma erred in overruling the motion for a new trial by the defendant made;

"B) Said court erred in rendering judgment for the State of Oklahoma.

"C) Said court erred in allowing said conviction for murder to stand when the evidence so admitted was sufficient to create a doubt as to the capacity of said defendant to commit the crime of murder as 'premeditation' was an absolute necessary element for conviction.

"D) Said court erred in not reducing the judgment and sentence to a bare minimum based on the 'psychiatric staff's' report from the State Mental Institution at Norman, Oklahoma, which is in evidence and more fully set forth in said casemade."

The appeal was lodged in this Court on June 11, 1963. After several extensions of time to brief, on October 23, 1963 defendant filed what he styled, "Statement of Counsel".

A short statement of the facts seems expedient.

Defendant was charged with having murdered his wife, Shirley Earlene Clouse on October 2, 1962. The defendant and Shirley Earlene Wadford were married in Prescott, Arizona on March 8, 1958, and had two children, ages 3 and 1 at the time of this difficulty. They had lived in Arizona, Arkansas, California, Oklahoma and back to Arizona during the time they were married, and Shirley Earlene returned to the home of her parents in Bryan County some time in 1963. She had gone to the law office of W. L. Steger in Durant, and he had prepared divorce papers for her, which he filed on September 19, 1963, and forwarded a copy of the petition with a waiver to the defendant in Arizona.

Defendant testified in his own behalf, and stated that on receipt of the divorce papers, he came back to Oklahoma, arriving in Durant some time after midnight about September 27 or 28. Later that day he went out to see his children, who, with his wife, were at the home of her parents in Albany, Bryan County. Defendant testified that approximately two days later he purchased a .22 calibre gun at a pawn shop in Albany for $15, and got a box of shells at a grocery store. He gave as his reason for buying the gun and shells that the night before as he was walking the three miles down a country road, after midnight, from his father-in-law's home to the place he was staying, someone in a car attempted to run him down, and he bought the gun for his protection.

The morning of this tragedy, October 2, 1962, the father of Mrs. Clouse, O. A. Wadford, brought his daughter and the defendant to Durant, and to Mr. Steger's office.

Mr. Steger testified that he saw Mr. and Mrs. Clouse in his office shortly after noon on October 2, 1962, and said:

"They both talked to me about the divorce, and I explained to them that if he would sign a waiver that we could get it very shortly, and if he didn't want to sign a waiver, that I didn't want to have anything to do with it.

And he later told me that he wanted to sign a waiver, and that she could have the divorce."

Mr. Steger testified that he then called his secretary and dictated the waiver, and stated that he explained to them that if he signed the waiver Mr. Clouse could go on, and Mrs. Clouse could come up later and the judge would hear the matter. Witness testified that everything seemed to be peaceful and calm, and he saw nothing unusual at the time he left his office to answer a call to come to the court house, and left his office.

Mrs. Hazel Stevens, Mr. Steger's secretary, testified that she typed the waiver and called Mr. and Mrs. Clouse to the front office and told them it was ready to sign, and Mr. Clouse printed his name on the waiver. She further testified:

"I told them that if they did not need to talk to Mr. Steger any further, that that would be all, and they turned towards the door. He hesitated for her to precede him, and she hesitated, and he said, 'Let's go', and she said, 'No', and turned back towards to me, and more or less whispered and said, 'He has a gun' and she stepped to the end of my desk, and he said, 'Let's go', and she said 'No', and he said, 'Sugar, I have done what you wanted me to. If you don't come now, you are not going to walk out', and she said, 'No', and he then pulled a gun from his jacket and shot her."

The evidence was that Mr. Clouse ran out of the office, and straight to the sheriff's office. Deputy sheriff John Newcombe testified:

"He walked in the door, and walked to my desk, and said, 'I want to give myself up.' I asked him what for, and he said, 'I just shot my wife.'

"Q Then what else happened? A When he said that, he pulled the gun out of his—out of his waistband, I presume—out from under his jacket, and laid it on the desk in front of me.

I asked him where, and he said, 'Over in Bill Steger's office.'"

The sheriff identified the gun, and testified that it had four empty cartridges in it at the time defendant turned it over to the sheriff's office.

Dr. Robert Engles, medical examiner for Bryan County testified that he examined the body of Mrs. Clouse the evening of October 2, 1962 at the Coffey Funeral Home. He said:

"Q Well, when you saw her, was she dead or alive? A She was dead.

"Q Do you know what produced her death, and if you do, tell the Court and jury. A Well, in my opinion she died of multiple gunshot wounds of her chest and head.

"Q Whereabouts on her head was she wounded? A Well, she had one wound on the back of her skull, on the —well, just to the right of the midline, which apparently entered into the cranial cavity. She had—

"Q (Interrupting) What you would call the base of the brain? A Yes, into the base of the skull.

"Q Where else was she wounded? A Well, there were two penetrating wounds on her left chest, right in the mid portion, over about the 9th and 10th ribs. * * *

"Q Would those wounds have caused her death? A Any one of them could have been capable of causing her death. In my opinion, the one into the brain, or into the skull was the—probably the bullet that caused the death."

On motion of the attorney for defendant, he was committed to the Central State Hospital at Norman, Oklahoma for mental examination. He was in the hospital from December 7, 1962 to February 20, 1963.

The defendant introduced the letter from the office of the Clinical Director of the hospital, dated February 18, 1963, addressed to the Judge of the District Court of

Bryan County, Hon. Ralph B. Hodges, which reads (omitting the caption):

"This letter is in regard to Mr. Donald R. Clouse who was sent to this hospital on 12–7–62 by a district court order for a period not to exceed 60 days with the charges of 'MURDER'.

"Psychiatric. evaluation, including psychological testing of Mr. Clouse has been completed. It is the opinion of the staff that Mr. Clouse experienced amnesia at the time of the above mentioned offense. He is able to recall events preceding and following the charge but not during the time of the actual offense. Mr. Clouse states that he has had similar but infrequent amnesic episodes during the past two years. Our staff has not been able to determine the exact cause for these amnesic episodes. His intellectual endowment is limited and his full scale IQ is 70, which is at the bottom of the borderline range. This in itself would not preclude his advising an attorney in his own defense but should be taken into consideration when conversing with him.

"Historical data indicates that he suffered severe head trauma at two years of age, and this may be a contributing factor to his intellectual functioning as well as his amnesic episodes. At the present time Mr. Clouse is able to distinguish between right and wrong and he could advise an attorney in his own defense, except for the above mentioned memory loss.

"It is not felt that a further period of observation of Mr. Clouse is needed. It is recommended that he be returned to the court for disposition."

With reference to the "severe head trauma", defendant's father and mother both testified that when he was about two years of age a mule kicked him in the face, and that he was under the care of the doctor for two months thereafter. The attorney for defendant in his statement refers to the defendant as "diminutive of stature, his face is concave as a direct result of the kick in the face by the mule at the age of two years; the scar on his forehead bears mute testimony to the tragedy borne out at an early age in life for this plaintiff in error."

In his argument, counsel for the defendant states:

"The position by the defense counsel is, that among the errors by the court committed were, (1) judgment and sentence upon conviction should have been modified, or reduced, by the court upon the admission into evidence of the 'psychiatric report of the staff at Griffin Memorial State Mental Hospital', at Norman, where the plaintiff in error, defendant herein, was by the court sent for observation for a period of 73 days prior to the trial; (2) that the plaintiff in error could not have been guilty of the crime of murder as one absolute, essential, and necessary element—premeditation—was lacking, based upon the medical report of the Psychiatric Staff of the Insane Asylum of Norman, Oklahoma."

Counsel cites no cases in support of his contentions.

Murder is defined by the Oklahoma statute (21 O.S.1961 § 701):

"Homicide is murder in the following cases.

"1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"2. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

Counsel contends that there is no evidence of premeditated design, but this Court has many times held that the "premeditated design" mentioned in the statute defining murder, quoted above, may be formed instantly, preceding the execution of the homicidal act. In fact, it is provided by statute (21 O.S.1961 § 702):

"A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."

And § 703 of the same Title reads:

"A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."

And see Jones v. State, 94 Okl.Cr. 359, 236 P.2d 102; Basham v. State, 47 Okl.Cr. 204, 287 P. 761; Fooshee v. State, 3 Okl. Cr. 666, 108 P. 554.

The Court in his instructions to the jury fully and fairly covered the law of the case. The rule is well settled that if from all the facts and circumstances attending the killing the jury can reasonably and satisfactorily infer the existence of the premeditated design or intention to kill, they will be warranted in so doing. The members of this Court have great sympathy for this unfortunate young man. There was evidence before the jury that his mentality was low. The Court and jury had the opportunity to hear and observe the defendant in the court room and on the witness stand. He was ably represented in his trial. By his own admission he had purchased a gun and ammunition a day or so before this homicide. He tried out the gun, which held nine bullets, by loading it and going hunting, shooting the gun nine times and then reloading. On the morning that he was going with his wife and her father to discuss the divorce action with his wife's lawyer, he placed the loaded gun in his boot. Under his own testimony, the jury might reasonably have believed that defendant deliberately armed himself for the purpose of taking the life of his wife.

It is well settled that where there is competent and substantial evidence in the record from which the jury might reasonably and logically conclude that the defendant is guilty of the crime charged, and no fundamental error appears in the record, this Court will not ordinarily interfere with the verdict.

We have also held that this Court does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances the sentence is so excessive as to shock the conscience of the Court. Hudson v. State, Okl.Cr., 374 P.2d 923; Cowling v. State, Okl.Cr., 327 P.2d 500; White v. State, 76 Okl.Cr. 147, 134 P.2d 1039.

Finding nothing in the record to justify interference with the verdict of the jury, the judgment and sentence of the district court of Bryan County is affirmed.

BUSSEY and NIX, JJ., concur.